**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
----------------------------x
                            :
VIETNAM VETERANS OF AMERICA  :
CONNECTICUT GREATER HARTFORD :
CHAPTER 120, VIETNAM VETERANS :
OF AMERICA, VIETNAM VETERANS  :
OF AMERICA SOUTHERN           :
CONNECTICUT CHAPTER 251,      :
VIETNAM VETERANS OF AMERICA   :
CONNECTICUT CHAPTER 270, AND  :
VIETNAM VETERANS OF AMERICA   :
CONNECTICUT STATE COUNCIL,    :
                            :
          Plaintiffs,       :
                            :
v.                          :    Civil No. 3:10CV1972(AWT)
                            :
DEPARTMENT OF HOMELAND       :
SECURITY, VETERAN'S AFFAIRS, :
AND DEPARTMENT OF DEFENSE,   :
                            :
          Defendants.       :
                            :
----------------------------x
```

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This action is brought by the Vietnam Veterans of America

("VVA") Connecticut Greater Hartford Chapter 120, Vietnam

Veterans of America, Vietnam Veterans of America Southern

Connecticut Chapter 251, Vietnam Veterans of America Connecticut

Chapter 270, and Vietnam Veterans of America Connecticut State

Council against defendants United States Department of Defense

(the "DoD") and its components Department of the Army,

Department of the Navy and Department of the Air Force and its

subcomponents the United States Marine Corps, the National Guard

Bureau, the Army National Guard, and the Air National Guard; the
United States Department of Homeland Security ("the DHS") and
its component, the United States Coast Guard;[1] and the United
States Department of Veterans Affairs ("VA") and its components,
the Veterans Health Administration and the Veterans Benefits
Administration, alleging violations of the Freedom of
Information Act ("FOIA"), 5 U.S.C. § 552.

The Amended Complaint seeks declaratory and injunctive
relief compelling the disclosure and release of agency records.
Specifically, the plaintiffs request the release of records
beginning in October 1, 2001 regarding the defendants' use of
personality disorder discharges when separating service members
from the armed forces.  The defendants have moved for summary
judgment.  For the reasons set forth below, the motion is being
granted in part and denied in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In late October 2010, the plaintiffs sent FOIA requests to:
the DoD and seven DoD components: the Army, the Navy, the Air
Force, the Marine Corps, the National Guard Bureau, the Army
National Guard, and the Air National Guard; the Coast Guard (a
component of the DHS); and two components of the VA, the
Veterans Health Administration and the Veterans Benefits

---

[1] After the motion for summary judgment was filed, the plaintiffs filed a
stipulation of dismissal with prejudice with respect to their claims against
the Department of Homeland Security and its component, the United States
Coast Guard.

Administration.  The FOIA request letters requested "all records related to the use by branches of the United States Armed Forces of personality disorder discharges and adjustment disorder discharges to separate members of the Armed Forces from service since October 1, 2001."[2]  (Am. Compl. Ex. A (Doc. No. 22) at 1; Am. Compl. Ex. C (Doc. No. 24) at 1).  The letters also provided a non-exclusive list of the types of records the plaintiffs were interested in.  In each of the requests, the plaintiffs agreed to pay search, duplication and review fees up to $100, but sought a fee waiver or reduction of any amount greater than $100.

By letters dated February 21, 2011, plaintiff VVA Chapter 270 sent nine additional FOIA requests to the DoD, its seven components, and the Coast Guard.  The requests were identical in substance to the October 2010 requests submitted to the same components.  Additionally, by letters dated March 7, 2011, plaintiffs VVA Chapter 251 and VVA Connecticut State Council sent another nine FOIA requests to DoD, its seven components, and the Coast Guard.  These requests were identical in substance to the October 2010 and February 2011 requests.

On December 15, 2010 the plaintiffs filed suit alleging that the defendants violated FOIA by failing to provide documents responsive to the plaintiffs' requests and seeking to

[2] The request letter to the United States Coast Guard substituted "Coast Guard" for "Armed Forces."  (Am. Compl. Ex. B (Doc. No. 23) at 1).

compel the release of such documents.  Subsequent to the filing of the complaint, the defendants conducted searches for responsive documents and produced to the plaintiffs the documents they found.  The plaintiffs contend, however, that the searches and the defendants' declarations with respect to their searches are inadequate.

After this litigation was commenced, the plaintiffs expressed to the defendants that their initial FOIA requests included not just aggregate data and policy documents, as the DoD and the Coast Guard had construed the requests, but also the personnel records (hereinafter "separation packets") of all of the service members discharged on the basis of a personality disorder since October 1, 2001.[3]  The defendants expressed skepticism as to the plaintiffs' position, so on April 4, 2011 the plaintiffs sent letters to the DoD and the Coast Guard in an attempt to eliminate any question as to the scope of their initial requests.  After sending the April 4, 2011 request letters, the plaintiffs' counsel and the defendants' counsel discussed how they would proceed with the new requests.  The parties discussed the fact that the documents that the defendants were scheduled to release in May 2011 might

---

[3] The plaintiffs also sought individual VA files for the same service members (hereinafter the "claims files").  The Veterans Benefits Administration concluded that the individual veterans' claims files would be responsive to the plaintiffs' request, but determined that the files were exempt from disclosure and therefore could not be released.

sufficiently address the issues that the plaintiffs were interested in and thereby obviate the need for the individual separation packets.  Therefore, the parties agreed that the plaintiffs would review the documents the defendants were scheduled to release in May 2011 and then determine how they wanted to proceed with respect to the separation packets.

The plaintiffs received the majority of the responsive documents on June 2, 2011.  The plaintiffs also received "a handful of additional records [that] have been discovered and released as a result of supplemental searches."  (Local Rule 56(a)(1) Stmt. ¶ 10).  The documents the plaintiffs received total more than 1,300 pages, and the defendants directed the plaintiffs to additional documents that were already publicly available.  The defendants withheld one document, an email between a staff judge and his Air Force clients, pursuant to FOIA Exemptions 5 and 6.  The Air Force also redacted the names and contact information of individuals "below the SES-level or military equivalent" pursuant to Exemption 6.  (Local Rule 56(a)(1) Stmt. ¶ 11).

After reviewing the documents, the plaintiffs' counsel informed the defendants' counsel that the plaintiffs still sought the individual separation packets.  The defendants agreed to provide the plaintiffs with several sample separation packets in order to help the plaintiffs narrow their requests.  Sample

separation packets from the Army, Navy and Marines were provided to the plaintiffs on July 29, 2011.  At the plaintiffs' request, another sample separation packet from the Navy was provided on September 14, 2011, and some additional documents from the sample service members' personnel files provided by the Marines and the Army were released to the plaintiffs on September 16, 2011 and October 21, 2011, respectively.  The defendants redacted certain information from the packets, invoking FOIA Exemption 6.

Based on the sample separation packets they received, the plaintiffs told the defendants that they would "narrow their request to a small, randomized sample of approximately 1,624 individual files."  (Local Rule 56(a)(2) Stmt. ¶ 21).  The plaintiffs also stated their willingness to narrow their requests for the VA claims files.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  On a motion for summary judgment in a FOIA action, "the defending agency has the burden

of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B); EPA v. Mink, 410 U.S. 73, 79 (1973)).  To satisfy that burden, the agency may rely on "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and [explaining in reasonable detail] why any withheld documents fall within an exemption." Id.

To establish the adequacy of a search, an agency affidavit or declaration must be "relatively detailed and non-conclusory" and "submitted in good faith." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted); see also Wood v. FBI, 432 F.3d 78, 85 (2d Cir. 2005).  This means, for instance, that an agency affidavit or declaration must describe in reasonable detail the scope of the search and the search terms or methods employed.  See, e.g., Maynard v. CIA, 986 F.2d 547, 559 (1st Cir. 1993); N.Y. Times Co. v. U.S. Dep't of Def., 499 F. Supp. 2d 501, 518 (S.D.N.Y. 2007). Because "[a]ffidavits submitted by an agency are accorded a presumption of good faith[,] . . . discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are

-7-

adequate on their face." Carney, 19 F.3d at 812 (quotation marks omitted).

## III. DISCUSSION

### A.   Individual Service Member Files

The plaintiffs argue that the searches conducted by the DoD, its components, and the Veterans Health Administration are facially inadequate because the agencies did not construe the plaintiffs' requests to include individual service member files.

#### 1.   Department of Defense Separation Packets

The DoD argues that the plaintiffs' original requests did not encompass the individual separation packets and that it was reasonable for the DOD and its components to interpret the requests as seeking only aggregate data.  The defendants argue, in the alternative, that if the requests did include the separation packets, the request is unduly burdensome.

"[A]n agency is obligated to construe a FOIA request liberally." Servicemembers Legal Defense Network v. Dep't of Defense and Dep't of Justice, 471 F. Supp. 2d 78, 86 (D.D.C. 2007).  "When the request demands all agency records on a given subject then the agency is obliged to pursue any 'clear and certain' lead it cannot in good faith ignore." Halpern v. F.B.I., 181 F.3d 279, 288 (2d Cir. 1999) (quoting Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996)).

Here, the plaintiffs' FOIA request letters contain an
introductory paragraph which is followed by a non-exhaustive
list of specific types of information they seek.  In the last
sentence in the introductory paragraph, the plaintiffs state,
"This letter requests <u>all records related to</u> the use by branches
of the United States Armed Forces of personality disorder
discharges and adjustment disorder and/or readjustment disorder
discharges to separate members of the Armed Forces from service
since October 1, 2001."  (Am. Compl. Ex. A at 1 (emphasis
added); Am. Compl. Ex. C at 1 (emphasis added)).  The letters
define "records" as "all records or communications preserved in
electronic or written form, including but not limited to
correspondence, documents, data, videotapes, audio tapes,
emails, faxes, files, guidance, guidelines, evaluations,
instructions, analyses, memoranda, agreements, notes, orders,
policies, procedures, protocols, reports, rules, technical
manuals, technical specifications, training manuals, or
studies."  (Am. Compl. Ex. A at 1 n.1; Am. Compl. Ex. C at 1
n.1).  Although many of the specifically enumerated items refer
to aggregate data and policies, the last sentence of the
introductory paragraph makes it clear that the plaintiffs are
seeking all records related to the use of personality disorder
and adjustment disorder discharges to separate service members.
<u>See</u> <u>Serv. Women's Action Network v. Dep't of Defense</u> ("SWAN I"),

888 F. Supp. 2d 231, 242 (D. Conn. 2012) ("The fact that every other request -- in both the DoD and VA FOIA letters -- appears to ask for aggregate data does not mean that [one specific request] may not ask for individual data.  It may explain why Defendants misread the request, but it is disingenuous for Defendants to now attempt to argue that this [request] never asked for 'all records.'").  The individual separation packets for members who were separated for such reasons fall squarely within the documents requested in the plaintiffs' FOIA letters.

However, "an agency need not respond to a request that is so broad as to impose an unreasonable burden upon the agency, such as one which requires the agency to locate, review, redact, and arrange for inspection a vast quantity of material." Serv. Women's Action Network v. Dep't of Defense ("SWAN II"), 888 F. Supp. 2d 282, 290 (D. Conn. 2012) (internal quotation marks omitted); see also Halpern, 181 F.3d at 288 ("[A]n agency need not conduct a search that plainly is unduly burdensome.").

The defendants estimate that there exist approximately 26,000 individual separation packets.  The plaintiffs believe that the number is closer to 31,000.  The defendants state that the separation packets contain personally identifying information and would therefore have to be heavily redacted before they could be released to the plaintiffs.  Using the more conservative figure of 26,000 and assuming that the average

separation packet contains 50 pages, the defendants estimate that it would take approximately 27 years and cost $571,912 in search fees and $194,985 in duplication fees to search for and produce the individual separation packets at a rate of 80 packets per month.  (Herrington Decl. (Doc. No. 37-20) ¶¶ 23, 24).

The plaintiffs do not contest the time and cost estimates or dispute that searching for and producing all of the individual separation packets would be unduly burdensome. Rather, the plaintiffs state that they have indicated their willingness to narrow their request to a representative sample of the separation packets and that the narrowed request is not unduly burdensome.  In the context of settlement negotiations, the plaintiffs initially offered to accept a sample of 8% of personality disorder separation packets.  The plaintiffs then revised their offer to accept approximately 5.64% of personality disorder separation packets, which would constitute approximately 1,624 individual separation packets.  In their opposition memorandum, although the plaintiffs do not state what percentage of adjustment disorder separation packets they would seek, they state that they are "willing to narrow their request."  (Pls.' Mem. Opp. Mot. Summ. J. (Doc. No. 42) at 10).

The defendants argue, and the court agrees, that the court should not consider whether the plaintiffs' proposed narrowed

search would be unduly burdensome.  Under FOIA, requesters may modify their requests after submission.  See 5 U.S.C. § 552(a)(6)(B)(ii) ("The agency shall . . . provide the person an opportunity to limit the scope of the request.").  However, "no statute requires a court to allow FOIA modifications during the course of litigation."  Serv. Women's Action Network v. Dep't of Defense ("SWAN III"), No. 3:11-CV-1534(SRU), 2013 WL 1149946, at *3 (D. Conn. Mar. 19, 2013).  Thus, it is proper for the court to rule on "the only request actually before [it]."  Id. at *4; see also Wilson v. U.S. Dep't of Transp., 730 F. Supp. 2d 140, 155 (D.D.C. 2010) ("[A]n agency need only conduct a search as to the original request, and not to subsequent additions or clarifications.").

The record here does not contain information sufficient for the court to assess the reasonableness of the narrowed search that the plaintiffs propose.  While the plaintiffs have proposed to accept approximately 5.64% of personality disorder separation packets, they have not identified the scope of their request for adjustment disorder separation packets.  Without knowing what the request is, the court cannot determine if it is a reasonable one.  More importantly, the DoD and its components have not made an administrative determination as to whether they would grant the plaintiffs' narrowed request for separation packets and whether the plaintiffs' narrowed request is unduly burdensome.

Ruling on the reasonableness of the scope of the narrowed request would allow an end-run around the requirement that FOIA requesters exhaust their administrative remedies.  See Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 61 (D.C. Cir. 1990) ("Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.").

Because the court can only consider the request actually before it -- here, the request for all of the individual service members' separation packets -- the court concludes that the plaintiffs' original request would have imposed an unreasonable burden on the defendants, and therefore they are not required to respond.  See Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce, 907 F.2d 203, 209 (D.C. Cir. 1990) ("An agency need not honor a request that requires an unreasonably burdensome search.").

### 2. Veterans Administration Files

With respect to the VA files, the defendant argues that the plaintiffs' request for the individual files is unduly burdensome.[4]  The defendants state that the plaintiffs' request would require the Veterans Benefits Administration (the "VBA")

---

[4] The court notes that as with the DoD, the Veterans Health Administration (the "VHA") did not construe the plaintiffs' request to include individual files.

to search through approximately 797,050 files located at 67 different facilities.  The search for the documents itself would take approximately 890,000 hours and cost $35,284,730.  The labor required to redact and duplicate the identified documents would take approximately 600,320 hours and cost $16,568,832. The estimated duplication fees would total approximately $1,125,000.  Searching for and duplicating the individual files at the VHA would involve a process similar to that at the VBA. The VHA estimates that the process would take approximately 4,000,000 hours.

As with the DoD separation packets, the plaintiffs do not contest the time and cost estimates or dispute that searching for and producing all of the claims files would be unduly burdensome.  The plaintiffs instead say that they are willing to narrow the scope of their request so that it is not unduly burdensome.  However, it is apparent from the plaintiffs' opposition memorandum that their offer to narrow the scope of their request to the VA was not made prior to the commencement of this litigation.  The plaintiffs state that they "hereby narrow their request for all VBA claims files and VHA application files to a sample of these files that correlates with the sample of [personality disorder] and [adjustment disorder] separation packets requested from DoD and its military components."  (Pls.' Mem. Opp. Mot. Summ. J. at 15).  The

plaintiffs then state that, alternatively, they would be willing to accept aggregate data from the VA.

For the reasons set forth above with respect to the separation packets, the court cannot consider the plaintiffs' proposed narrowed search, especially where the proposal is made for the first time in the plaintiffs' memorandum in opposition to the motion for summary judgment.  The court can only consider the request that was actually made to the VA.  Because the original request made by the plaintiffs was unduly burdensome,[5] the VA is not required to respond.

**B.**   **Search and Duplication Fees**

In their opposition to the motion for summary judgment, the plaintiffs' state that the "[d]efendants have unlawfully charged search and duplication fees."  (Pls.' Mem. Opp. Mot. Summ. J. at 19).  While the plaintiffs' memorandum is unclear as to which defendants have charged search and duplication fees and for which records, it appears that the plaintiffs are referring to the individual service member files discussed in Section III.A, above.  Because the court has determined that the plaintiffs'

---

[5] The parties' memoranda discuss whether the VA properly invoked FOIA Exemptions 3 and 6 with respect to the VA claims files.  The VA determined that it could not release the claims files at all because they are exempted by FOIA.  The plaintiffs argue that the entire files are not exempt, but that instead information within the files is exempt.  Therefore, they seek heavily redacted copies of the claims files.  However, because the court finds that the search, duplication and redaction of the VA claims files would be unduly burdensome and therefore that the defendant does not need to respond, the court need not address the application of Exemptions 3 and 6 to the claims files.

requests for the individual service member files are unduly
burdensome and the defendants were not required to respond, the
issue of whether search and duplication fees may be assessed is
moot.

    **C.**   **Adequacy of Agency Searches**

    The defendants have moved for summary judgment on the
adequacy of the searches that each agency undertook in
responding to the plaintiffs' FOIA requests.  The plaintiffs
argue that the defendants have not met their burden of showing
that the searches were adequate and object to the declarations
submitted in support of the searches.[6]

    FOIA mandates that in responding to "a request for records,
an agency shall make reasonable efforts to search for the
records . . . ."  5 U.S.C. § 552(a)(3)(C).  To prevail on
summary judgment when the adequacy of an agency's search is at
issue, "the defending agency must show beyond material doubt
that it has conducted a search reasonably calculated to uncover
all relevant documents." Morley v. CIA, 508 F.3d 1108, 1114
(D.C. Cir. 2007) (internal quotations omitted).  "[T]he issue to
be resolved is not whether there might exist any other documents
possibly responsive to the request, but rather whether the
search for those documents was adequate."  Weisberg v. U.S.

---

[6] The plaintiffs' objections are voluminous, and the court does not address
each and every objection the plaintiffs raise with respect to every
declaration and search.

Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis
in original).   The adequacy of the agency's search is judged by
a standard of reasonableness.   See Grand Cent. P'Ship, Inc. v.
Cuomo, 166 F.3d 473, 489 (2d Cir. 1999) ("[A]n agency's search
need not be perfect, but rather need only be reasonable.").

     "In adjudicating the adequacy of the agency's
identification and retrieval efforts, the trial court may be
warranted in relying upon agency affidavits."   Morley, 508 F.3d
at 1116.   "The Second Circuit has adopted the D.C. Circuit
position that such reliance is only appropriate, however, when
agency affidavits are relatively detailed and nonconclusory, and
submitted in good faith."   El Badrawi v. Dep't of Homeland Sec.,
583 F. Supp. 2d 285, 298 (D. Conn. 2008) (citing Grand Cent.
P'Ship, 166 F.3d at 488-89) (internal quotation marks omitted).
Thus, "[a] district court in a FOIA case may grant summary
judgment in favor of an agency on the basis of agency affidavits
if they contain reasonable specificity of detail rather than
merely conclusory statements, and if they are not called into
question by contradictory evidence in the record or by evidence
of agency bad faith."   Grand Cent. P'Ship, 166 F.3d at 478
(emphasis in original) (internal quotation marks omitted).

     In reviewing affidavits for "reasonable specificity,"
district courts will look for an affidavit to "set[] forth the
search terms and the type of search performed, and aver[] that

all files likely to contain responsive materials (if such
records exist) were searched . . . ." <u>Oglesby v. U.S. Dep't of
Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990).  Additionally, an
"affidavit[] should identify the searched files and describe at
least generally the structure of the agency's file system which
renders any further search unlikely to disclose additional
relevant information." <u>El Badrawi</u>, 583 F. Supp. 2d at 298
(internal quotation marks omitted).  An agency need not describe
all of its file systems, but instead "an adequate description
need only provide reasonable detail about the parameters and
execution of an agency's search and aver that all files likely
to contain responsive material were searched." <u>SWAN I</u>, 888 F.
Supp. 2d 231, 245 (D. Conn. 2012).

        "Affidavits submitted by an agency are accorded a
presumption of good faith." <u>Carney v. U.S. Dep't of Justice</u>, 19
F.3d 807, 812 (2d Cir. 1994).  Thus, if agency submissions are
adequate on their face, "the plaintiff must make a showing of
bad faith on the part of the agency sufficient to impugn the
agency's affidavits or declarations." <u>Id.</u>

        "An affidavit from an agency employee responsible for
supervising a FOIA search is all that is needed to satisfy Rule
56(e); there is no need for the agency to supply affidavits from
each individual who participated in the actual search." Id. at
814.  However, "the agency employee submitting an affidavit must

have some personal involvement in supervising the FOIA search." El Badrawi, 583 F. Supp. 2d at 298.

"If agency affidavits fail to meet standards, a "district court will have a number of options for eliciting further detail from the government.  It may require supplemental . . . affidavits or may permit appellant further discovery." Halpern, 181 F.3d at 295.  "When the courts have permitted discovery in FOIA cases, it is generally limited to the scope of the agency's search." El Badrawi, 583 F. Supp. 2d at 301.  Further, courts have consistently held that "a court should not, of course, cut off discovery before a proper record has been developed; for example, where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." Exxon Corp. v. FTC, 466 F. Supp. 1088, 1094 (D.D.C. 1978).

### 1.   Department of Defense

In support of its motion for summary judgment, the DoD submitted the declarations of William Kammer ("Kammer"), Chief, Office of Freedom of Information Division; Michael Pachuta ("Pachuta"), Deputy Director for Policy, Officer & Enlisted Personnel Management, Office of the Deputy Assistant Secretary of Defense for Military Personnel Policy; Samuel Peterson ("Peterson"), Freedom of Information Act and Privacy Act

Specialist for the Defense Manpower Data Center; Linda Thomas[7]
("Thomas"), Director, Tricare Management Activity Privacy and
Civil Liberties Office; and Robert Welch ("Welch"), Executive
Officer and Chief of Staff for the Armed Forces Health
Surveillance Center.

     After receiving the plaintiffs' request, the Freedom of
Information Division at the DoD "tasked" the Defense Manpower
Data Center ("DMDC"), the Office of the Undersecretary of
Defense for Personnel and Readiness ("OUSD (P&R)"), the Office
of the Secretary of Defense and the Office of the Chairman of
the Joint Chiefs of Staff to conduct a search for responsive
records.  The Office of the Assistant Secretary of Defense for
Health Affairs ("OASD (HA)") was later tasked to conduct a
search as well.  The offices were chosen based on the nature of
the work performed by the agency.

     The DMDC maintains "the largest and most comprehensive
central archive of personnel, manpower, casualty, pay,
entitlements, procurement, survey, testing, training and
financial data in the DoD."  (Kammer Decl. (Doc. No. 37-3) ¶ 5).
DMDC informed the Freedom of Information Division that it only
maintained documents responsive to Items 1 and 2 of the

---

[7] The person who originally processed the request passed away prior to
drafting a declaration describing her search.  While Thomas was not present
at the time the search was completed, she "reviewed the administrative
record, including the request, requests for search among various offices, and
their responses, and [was] briefed by the staff who conducted the search."
(Thomas Decl. (Doc. No. 45-12) ¶ 2).

plaintiffs' request.  After determining how separations for
personality disorder were coded in DMDC's files, DMDC searched
"its Active Duty Military Personnel Transaction File, Reserve
Components Common Personnel Data System Transaction File, and
Contingency Tracking System File" for separations based on
personality disorder.  (Samuel Peterson Decl. (Doc. No. 37-5) ¶
12).

The declarations submitted by Kammer and Peterson are
insufficient to show that DMDC conducted an adequate search.
The declarations do not describe DMDC's filing system, but
instead only list the files that DMDC searched.  Kammer and
Peterson do not state why those files were selected to be
searched at the exclusion of others.  Additionally, Peterson
does not describe how the search of DMDC's files was conducted.
While he explains the process whereby DMDC determined which
search terms to use, he does not state which search terms
ultimately were used.  Thus, the court is unable to determine
whether the search conducted by DMDC was adequate.

The OUSD (P&R) "develops policies, plans, and programs to
ensure the readiness of the Total Force as well as the efficient
and effective support of peacetime operations and contingency
planning preparedness."  (Kammer Decl. ¶ 7).  Pachuta conducted
a physical search of office administrative files for documents
responsive to the plaintiffs' request.  He also conducted a

-21-

search for electronically stored files.  Pachuta describes that
the OUSD (P&R) has an "electronic file system on a shared drive
that maintains folders on the various military personnel policy
subjects administered by the office."  (Pachuta Supp. Decl.
(Doc. No. 45-11) ¶ 1).  He searched the Separations Policy
folder and the Hearing Preparation folder using the key words
"personality disorder," "adjustment disorder" and "readjustment
disorder."  He also used the same key words to search the Office
of the Secretary of Defense Staff Action Correspondence Control
Portal, which contains electronic files of all staff actions
since 2007 by offices within the Office of the Secretary of
Defense.

        The declarations provided by Kammer and Pachuta do not
adequately describe OUSD (P&R)'s search to show that it was
reasonably calculated to find all responsive documents.  While
Pachuta describes that OUSD (P&R) maintains an electronic file
system, he does not explain why he searched only two folders on
the shared drive for responsive documents.  Additionally, he
refers to the Secretary of Defense Staff Action Correspondence
Control Portal as containing files of all staff actions, but he
does not describe what he means by "staff actions" or what types
of documents could be expected to be found in the Portal.  Thus,
the declarations do not show that OUSD (P&R)'s search was
adequate.

The OASD (HA) "oversees the DoD Military Health System, a global medical network within the DoD that provides healthcare to all U.S. military personnel worldwide." (Kammer Decl. ¶ 11). Thomas states Health Affairs ("HA") and Tricare Management Activity ("TMA") "are logical places to search." (Thomas Decl. ¶ 4). TMA and HA contain have databases, but they were not searched because neither database maintains military discharge status. Additionally, it was determined that DMDC could produce more comprehensive results, and therefore HA and TMA "were not the agencies of record for the requested records." (Thomas Decl. ¶ 5).

OASD (HA) also "tasked" the Office of Chief Medical Officer and the Office of Deputy Assistant Secretary for Force Health Protection and Readiness ("FHP&R") to search for records responsive to the plaintiffs' request. The Deputy Chief Medical Officer at the Office of Chief Medical Officer reported that based on his personal knowledge of the office, the office did not contain responsive records. However, the Deputy Chief Medical Officer suggested that searches be conducted at the Deputy Under Secretary of Defense, Military Personnel Policy and the OUSD (P&R)[8]. FHP&R searched three of its subordinate offices most likely to contain responsive records: the Armed Forces Medical Health Surveillance Center; the Defense Center of

---

[8] The search of this office is discussed above.

Excellence for Psychological Health and Traumatic Brain Injury; and the Office of Psychological Health Strategic Operations.

The Armed Forces Medical Health Surveillance Center "is the central epidemiological health resource for the U.S. Military." (Welch Decl. (Doc. No. 45-13) ¶ 3). The center maintains the Defense Medical Surveillance System, which contains "up-to-date and historical data on recorded health diagnoses . . . and experiences of Service members throughout their military careers." (Welch Decl. ¶ 3). The center informed the plaintiffs that it was unable to respond to their request because the "data maintained in the [Defense Medical Surveillance System] do not include separation records nor contain details on the reasons Service members are separated from the military." (Welch Decl. ¶ 7).

The Defense Center of Excellence for Psychological Health and Traumatic Brain Injury reviewed its database for responsive information. It also reviewed the Armed Forces Health Longitudinal Applications system. However, "it was determined that these databases lacked the necessary data elements, chiefly, their database does not include discharge status." (Thomas Decl. ¶ 8). The center suggested that the FHP&R front office be searched. However, the front office "declined to search" based on their "knowledge of their mission functions and associated sets of records." (Thomas Decl. ¶ 8).

Despite the fact that the Office of Psychological Health Strategic Operations was identified as one of the three FHP&R offices most likely to have responsive records, Thomas states that the office "would not have been tasked to search . . . based on the FHP&R front office referral to [the Office of Chief Medical Officer]."  (Thomas Decl. ¶ 8).

The court finds that the declarations submitted in support of OASD (HA)'s searches are insufficient to show that OASD (HA) conducted a search that was reasonably calculated to uncover all relevant documents.  Thomas's declaration shows that all but one of the offices which were directed to search for responsive records simply declined to do so, stating that they would not have responsive documents.  However, her declaration does not describe what those offices do contain and why they would not have any responsive documents.  In fact, Thomas's declaration reflects that none of the offices within OASD (HA) conducted an actual search.[9]  Additionally, Thomas's declaration shows that two offices potentially containing responsive documents were never searched.  The Deputy Chief Medical Officer suggested that the Deputy Under Secretary of Defense, Military Personnel Policy might have responsive records, but Thomas does not aver that

---

[9] While the Defense Center of Excellence for Psychological Health and Traumatic Brain Injury reviewed its database and the Armed Forces Health Longitudinal Applications system for responsive information, the center determined that those two sources did not contain the necessary data elements to retrieve responsive records.

that office was ever searched or explain why it was not.
Likewise, Thomas does not explain why FHP&R's front office's
referral to the Office of the Chief Medical Officer would
obviate the need to search the Office of Psychological Health
Strategic Operations when it was identified as one of the three
FHP&R offices likely to have responsive records.  Thus, OASD
(HA) has not shown that it conducted an adequate search.

Based on the foregoing, the declarations submitted by the
DoD do not meet their burden of showing beyond material doubt
that the search conducted by the DoD was adequate.  Therefore,
the motion for summary judgment is being denied as to the
adequacy of the search and the plaintiffs are permitted limited
discovery concerning the adequacy of the search.

### 2.   Army

In support of its motion for summary judgment, the Army
submitted the declarations of eleven individuals: Mary Nance
Jordan ("Jordan"), Program Analyst, Freedom of Information and
Privacy Act Specialist for the U.S. Army; Kathleen Vaughn-
Burford[10] ("Vaughn-Burford"), Management Analyst in the
Department of the Army G-1; Gerald Conway ("Conway"), Deputy
Chief, Enlisted Career Systems Division; David Sproat

---

[10] Vaughn-Burford was not the original Action Officer in charge of the Army G-1's search.  The original Action Officer retired after the search was completed but before she was required to provide a declaration.  Thus, Vaughn-Burford "rel[ied] on the case folder and notes to prepare the declaration."  (Vaughn-Burford Decl. (Doc. No. 37-7) ¶ 3).

("Sproat"), Assistant Deputy for Health Affairs in the Office of
the Deputy Assistant Secretary of the Army for Manpower &
Reserve Affairs; Ronald Hoggard ("Hoggard"), Information Release
Specialist for the Department of the Army Human Resources
Command; Lawrence Bosworth ("Bosworth"), Chief,
Operations/Training Branch, HRC PERSIND/Technology Division;
Scott Kuhar ("Kuhar"), Chief, Transition Branch, HRC; Jose
Burgos ("Burgos"), Chief, Freedom of Information Program for the
Chief Attorney and Legal Services Directorate, Office of the
Administrative Assistant to the Secretary of the Army; Rudolph
Koger ("Koger"), Chief of Staff for the Army Review Boards
Agency; John Peterson ("Peterson"), Chief, Freedom of
Information and Privacy Act Office, Headquarters, U.S. Army
Medical Command; and Jacquelyn Randolph ("Randolph"), Chief,
Attitude and Opinion Research Unit, U.S. Army Research Institute
for the Behavioral and Social Sciences.

Jordan's declaration discusses the initial steps that were
taken after the Army received the plaintiffs' request letters.
Based on, inter alia, her consultation with Peterson, Internet
review of various agencies' functions and where similar requests
had been referred to in the past, Jordan determined that the
request should be referred to (1) the Army G-1; (2) the Human
Resources Command, which is a part of the Army Medical Command;

(3) the Army Review Boards Agency; and (4) the Army Medical Command ("MEDCOM").[11]

After receiving the referral from Jordan's office, the action officer responsible for the plaintiffs' request at the Army G-1 determined, based on her experience, that the Demographics Office and the Enlisted Career Systems Division were the offices within the Army G-1 that were likely to have responsive records.  The action officer made this determination because the Demographics Office "maintains human resources trend data, of which enlisted separations by reason for separation is a category" and because the Enlisted Career Systems Division "is responsible for enlisted Separations policy."  (Vaughn-Burford Decl. ¶ 3).  The searches resulted in several responsive documents, but Vaughn-Burford was unable to discern based on the case files which office had provided which documents.  Thus, she directed the Demographics Office and the Enlisted Career Systems Division to conduct a new search.

The Demographics Office "collects and compiles a full-range of human resources statistical data for summary reports to evaluate and support senior level decisions relative to readiness of the Force and G-1/M&RA policies and programs." (Vaughn-Burford Decl. ¶ 7).  Dr. Maxfield ("Maxfield") of the Demographics Office "accessed her demographics files and

---

[11] Each of these offices has submitted affidavits describing its search.

-28-

provided the spreadsheet she maintained." (Vaughn-Burford Decl. ¶ 7). Based on Maxfield's knowledge of the data and reports her office maintains or creates, she determined that the spreadsheet was the only responsive document her office contained.

The Enlisted Career Systems Division conducted a search of the "loss files" maintained in the Army's Total Army Personnel Database. From this search, the division created a document showing all personality disorder discharges. The Deputy Chief of the Enlisted Career Systems Division, Conway, determined that there were no other responsive documents. Conway states that "[o]ther than information contained within the [Total Army Personnel Database] and AR 635-200, the two places [he has] kept information on [personality disorder separations] is a particular PST folder within Microsoft Outlook and a folder on [the] shared 'H' drive." (Conway Decl. (Doc. No. 45-4) ¶ 3). Based on his involvement with the Enlisted Career Systems Division's involvement with personality discharges since "the beginning," he avers that no other files exist on this topic. With respect to the PST folder and the H drive, Conway states that neither location contains an extremely large number of items, and therefore he was able to look at every item to determine whether it was responsive; he did not need to use search terms.

Based on her conversation with Conway, Vaughn-Burford
requested that the Assistant Secretary of the Army for Manpower
and Reserve Affairs conduct a search of its hardcopy and
electronic records.  The request was referred to the office's
subcomponent, the Deputy Assistant Secretary of the Army for
Manpower and Reserve Affairs ("DASA(MP)").  DASA(MP) is
responsible for oversight of medical and personnel policy and
programs.  The office maintains files in the "action officer"
folder under the Assistant Secretary of the Army for Manpower
and Reserve Affairs.  Sproat, Assistant Deputy for Health
Affairs at DASA(MP) conducted a search of the action officer
folder using the search terms "personality" and "PD."  He avers
that "[b]ased on the way information is maintained in DASA(MP),
these two terms would capture any [responsive document] . . .
including those regarding adjustment disorder."  (Sproat Decl.
(Doc. No. 45-9) ¶ 4).  Sproat also searched his own folder and
the folder of another DASA(MP) employee.  Based on his seniority
in DASA(MP), Sproat states that he would have personal knowledge
and access to any responsive document in DASA(MP).

The declarations submitted on behalf of the Army G-1 are
insufficiently detailed to show that the Army G-1 conducted a
search that was reasonably calculated to uncover all relevant
documents.  Vaughn-Burford's declaration does not adequately
describe why her predecessor chose to refer the plaintiffs'

request to the three offices discussed above, but to no others.
Thus, the court is unable to determine whether the Army G-1's
decision to search only three offices was reasonably calculated
to uncover all relevant documents.  As to the search conducted
by the Demographics Office, Vaughn-Burford's declaration is
insufficiently detailed.  She does not address the office's
filing system and does not specify how the search for documents
was conducted.  She states only that Maxfield "accessed her
demographic files," which is not a sufficiently detailed
description of the search.  With respect to the Enlisted Career
Systems Division, Conway's declaration adequately describes the
office's filing system and how he conducted his search.
However, Conway mentions that information is contained within
the "AR 635-200," but does not state what the AR 635-200
contains or whether and how it was searched.  Thus, the court
cannot determine whether the search his office conducted was
sufficient.  As to DASA(MP), the court finds that Sproat's
declaration is insufficiently detailed.  Sproat discusses the
location of DASA(MP)'s electronic files, but his reference to
his own folder and the other DASA(MP) staff member's folder
makes it is unclear whether the office also maintains paper
files or whether these are electronic files maintained
separately from the "action officer" folder.  Additionally,
Sproat's statement that "personality" or "PD" would capture

documents relating to adjustment disorder is conclusory; he does not explain why that would be so.  Therefore, the court finds that the declarations submitted in support of the Army G-1's search are insufficient to show beyond material doubt that its search was adequate.

After the Human Resources Command ("HRC") received the plaintiffs' request, Hoggard, an information release specialist with the HRC, contacted Vaughn-Burford because the statistical data that the plaintiffs sought was within the Army G-1's purview and likely not located within the HRC.  At that time, Vaughn-Burford informed him that HRC need not respond because the Army G-1 was working on responding to the request.  Subsequently, however, Vaughn-Burford asked Hoggard to verify that HRC's Separation Branch did not have responsive documents.  Hoggard then "tasked" the Transition Branch, which maintains HRC records on separations, to conduct a search.  Hoggard also later referred the plaintiffs' request to the U.S. Army Physical Diability Agency and the PERSIND branch, both of which are within the HRC.

The Transition Branch maintains a database that contains data provided by the Army G-1 on individuals separated from the Army.  The database contains the following fields: name, social security number, rank, grade, sex, race, ethnicity, primary military occupational specialty, separation program designator,

separation category, fiscal year, basic active service date,
loss date, command, station, and unit identification code.  The
database only contains data back to 2008.  The Transition Branch
Chief, Kuhar, searched the database by using "separation codes
JFX and LFX relating to personality disorders, and JFV . . . and
LFV relating to other physical or mental conditions."  (Kuhar
Decl. (Doc. No. 45-6) ¶ 4).  In addition to searching the
database, the Transition Branch conducted a search of their
computers that "looked for the phrases 'personality disorder,'
'adjustment disorder' and 'readjustment disorder.'"  (Hoggard
Decl. (Doc. No. 37-9) ¶ 7).  The Transition Branch does not
maintain paper records.

    The U.S. Army Physical Disability Agency responded to the
referral from Hoggard stating that it did not have any
responsive records.  The agency advised Hoggard that it "only
maintained records on individuals processed through the
disability system, and not Soldiers separated administratively."
(Hoggard Decl. ¶ 11).

    The PERSIND branch created three spreadsheets that contain
the number of members of the Army who have been separated on the
basis of personality since 2001.  The spreadsheets were created
using the personality disorder separation codes "JFX" and "LFX."
(Bosworth Decl. (Doc. No. 45-2) ¶ 2).  PERSIND did not use codes
"JFV" or "LFV" to search for separations based on adjustment

disorder because those codes would "capture[] information unrelated to adjustment disorder discharges." (Bosworth Decl. ¶ 3).

The declarations submitted on behalf of the HRC are insufficiently detailed to show that the HRC conducted a search that was reasonably calculated to uncover all relevant documents. Hoggard and Kuhar's declarations do not adequately describe the Transition Branch's file system. Although they describe in sufficient detail the database that the Transition Branch maintains, they do not describe how the branch's other electronic files are maintained. They state only that the listed search terms were used to "determine if anyone had a record of any case on their computer" with those phrases. Such description is not adequately detailed. Hoggard's declaration with respect to the response he received from the U.S. Army Physical Disability Agency is devoid of detail. From his declaration, the court is unable to discern how, or even if, the agency conducted a search. As to the PERSIND branch, Hoggard and Bosworth do not state what database was searched using the separation codes that they list. They also do not describe what information the database contains or whether PERSIND maintains any other filing systems. Thus, the declarations are insufficiently detailed to show beyond material doubt that the search conducted by the HRC and its offices was adequate.

The Army Review Boards Agency (ARBA) is the highest level
for review of personnel actions taken by lower levels of the
Army.  It administers fifteen boards, including the Army Board
for Correction of Military Records and the Army Discharge Review
Board.  After receiving the plaintiffs' request, Rick Schweigert
("Schweigert") conducted a search for records responsive to Item
12 of the plaintiffs' request.  Schweigert "made visual and
physical searches of current and archived paper, electronic
files and databases" for responsive records that were not
already available to the public.  (Burgos Decl. (Doc. No. 37-10)
¶ 7).  The search did not produce any responsive records.

The ARBA also maintains the ARBA Case Tracking System
("ACTS").  ACTS is used to account for, process, and manage
cases for the fifteen boards administered by the ARBA.
"The ACTS databases contain basic information related to each
applicant, application and case to include name, SSAN, and
mailing address, date of receipt, applicant request, case ID,
case issues, case location, case responsibility, analyst of
record, case status, board type, board date, final decision, and
final decision date." (Koger Decl. (Doc. No. 45-5) ¶ 3).  The
ARBA conducted a search in ACTS for cases potentially involving
requests for discharge upgrades or record corrections from
former service members who received a discharge for personality
disorder from September 2001 to October 2010.  The search did

not include a separate search for "adjustment disorder" or "readjustment disorder" because those terms are not used in ACTS.  The search used the following terms to search for cases potentially involving personality disorder, adjustment disorder, or readjustment disorder: "Personality Conflict; Personality Disorder (Old character & behavior disorder); No Neuropsychiatric (NP) Evaluation; Chp 5, E, Convenience, Personality Disorder, Character; Chp 5, E, Convenience, Personality Disorder, Reason; Chp 5, E, Convenience, Personality Disorder, Process; Psychiatric/Psychological Problems; Vietnam War Syndrome; and Administrative Discharge - PTSD."  (Koger Decl. ¶ 6).

The declarations submitted on behalf of the ARBA are insufficiently detailed to show that the ARBA conducted a search that was reasonably calculated to uncover all relevant documents.  The Burgos declaration is conclusory and lacks detail regarding ARBA's filing systems and the search conducted by Schweigert.  While Koger explains one search that was conducted by ARBA of the ACTS database, that one search is insufficient to show that ARBA otherwise conducted an adequate search.  Therefore, the declarations do not show beyond material doubt that the search conducted by the ARBA was adequate.

John Peterson, Chief of the FOIA Office at MEDCOM coordinated with Alvin Fahie ("Fahie"), the Office Administrator

of the Directorate Health Policy & Services to determine whether any MEDCOM entities might have responsive records.  The Directorate Health Policy & Services is a part of the Behavioral Health Division, which is "intended to be a central point of contact for all behavioral/psychological health policy and implementation issues in support of the U.S. Army."  (John Peterson Decl. (Doc. No. 37-8) ¶ 4).  Fahie "tasked" Isaias Garcia ("Garcia"), the web developer for the Directorate Health Policy & Services, to search for responsive records.  Garcia searched the Behavioral Health Division's storage network using a Windows Explorer search for the keywords "PTSD," "personality disorder," "adjustment disorder," "readjustment disorder," "PD," "AD" and "RD."  (John Peterson Decl. ¶ 5; John Peterson Supp. Decl. (Doc. No. 45-7) ¶ 2).  Garcia then reviewed each result to determine whether it was relevant to the plaintiffs' request.  In addition to Garcia's search, Fahie "conducted a search of his computer, desk, personal files, and office files including hard copy and electronic files."  (John Peterson Supp. Decl. ¶ 5).

The two declarations submitted by Peterson on behalf of the MEDCOM are sufficiently detailed to show that MEDCOM conducted a search that was reasonably calculated to uncover all relevant documents.  Peterson adequately explains why he determined that the Behavioral Health Division should be searched for responsive documents.  Although the search described in his first

declaration was not adequate, the subsequent searches he
directed Garcia and Fahie to conduct were reasonably calculated
to uncover all relevant documents and are described in
sufficient detail in his supplemental declaration.  Peterson
describes the electronic storage network that the division
maintains and how Garcia conducted the search.  Additionally, he
avers that Fahie searched the division's records, which included
files stored in his computer, desk, personal files and office
files.  Thus, Peterson's affidavits show that MEDCOM's search
was adequate.

Based on the foregoing, the declarations submitted by the
Army do not meet their burden of showing beyond material doubt
that the search conducted by the Army was adequate.  Although
the court concludes that MEDCOM's search was adequate, the
declarations describing the other searches are insufficient to
show that the <u>entire</u> search conducted by the Army was reasonably
calculated to uncover all relevant documents.  Therefore, the
motion for summary judgment is being denied as to the adequacy
of the search and the plaintiffs are permitted limited discovery
concerning the adequacy of the searches.

### 3.    *Navy*

In support of its motion for summary judgment, the Navy
submitted the declarations of Robin Patterson ("Patterson"),
Head of the Department of the Navy, Chief of Naval Operations,

-38-

Privacy and Freedom of Information Act Policy Office; David German ("German"), Freedom of Information Act and Privacy Act Officer, Bureau of Naval Personnel ("BUPERS") and Commander, Navy Personnel Command; and Salvatore Maida ("Maida"), Freedom of Information Act and Privacy Act Officer, Bureau of Medicine and Surgery.

Clarice Julka ("Julka") was the processor assigned to the plaintiffs' request.  "Based on her experience and knowledge of Navy structure and commands, she determined that the commands likely and reasonably expected to maintain the records sought were the Navy Personnel Command (NPC), the Assistant Secretary of the Navy for Manpower and Reserve Affairs (ASN M&RA), and the Navy Bureau of Medicine and Surgery (BUMED)."  (Patterson Decl. (Doc. No. 37-12) ¶ 9).  Patterson concurred in the determination and he avers that it was unlikely that any other commands would have responsive documents.

The Bureau of Naval Personnel ("BUPERS") and Commander, Navy Personnel Command ("CNPC") is the "record holding activity for the U.S. Navy Official Military Personnel File."  (German Decl. (Doc. No. 37-11) ¶ 5).  After receiving the plaintiffs' request, BUPERS/CNPC determined that the Navy Personnel Command Records/Data Maintenance Quality Division ("PERS-33") and Navy Personnel Command Conduct and Separations Division ("PERS-835") were the two offices most likely to contain responsive records.

PERS-33 coordinated with the Defense Manpower Data Center
("DMDC") to search DMDC's Personnel Data Repository using a
Statistical Analysis Software.  The Data Repository was searched
using personality disorder separation codes.  PERS-33 was unable
to search for adjustment disorder discharges because codes for
those discharges "are comingled with other reasons for
separation."  (German Decl. ¶ 8(a)).  Additionally, PERS-33 was
unable to search the Data Repository for readjustment disorder
discharges because they "are not familiar with that term as a
reason for discharge."  (German Decl. ¶ 8(a)).

PERS-33 coordinated with the Defense Manpower Data Center
BUPERS/CNPC also conducted a search of electronic data
stored on the "Branch Head desk-top computer hard-drive" within
PERS-835.  (German Supp. Decl. (Doc. No. 45-14) ¶ 8(b)).  The
search was conducted "using subject knowledge and/or key words
or acronyms 'Personality Disorder,' 'PD,' 'Post Traumatic Stress
Disorder,' 'PTSD,' and 'Adjustment Disorder.'"  (German Supp.
Decl. ¶ 8(b)).  In addition to the electronic search,
BUPERS/CNPC found four responsive documents in the Navy Military
Personnel Manual.  BUPERS/CNPC suggested that the Board of
Corrections of Naval Records and the Navy Discharge Review Board
may contain responsive records as well.

German's declarations are insufficient to show that
BUPERS/CNPC conducted an adequate search.  While he states that
responsive documents were found in the PERS-835 hard-drive and

the Navy Military Personnel Manual, he does not describe the
types of filing systems that BUPERS/CNPC maintains.  His
reference to the Navy Military Personnel Manual suggests that
certain documents are maintained in hard-copy, but he does not
reference any other locations where hard-copy files and
documents are stored.  Additionally, German does not state how
PERS-835 located the responsive documents in the Navy Military
Personnel Manual other than "[t]hrough subject-matter
knowledge."  (German Supp. Decl. ¶ 8(b)).  Such a statement does
not demonstrate with reasonable specificity how the search was
conducted.  Therefore, German's declarations do not show that
BUPERS/CNPC conducted an adequate search.

Based on BUPERS/CNPC's suggestion, Patterson asked the
Board of Corrections of Naval Records ("BCNR") and the Navy
Discharge Review Board ("NDRB") to search for responsive
information.  The BCNR and the NDRB review and provide
administrative remedies within the Department of Navy.  Most
applications for relief at the BCNR request the upgrade of the
characterization of an administrative discharge.  Patterson's
declaration states that BCNR does not maintain a database of the
types of discharges in the cases that come before it or the
ratio of cases in which relief is granted or denied for
different types of discharges.  Patterson avers that the only
place where BCNR would have information responsive to the

-41-

plaintiffs' request is in the individual case files.  While BCNR
takes the position that the plaintiffs' request did not
encompass the individual files, if it did, those files are
publicly available online, and therefore BCNR was not required
to retrieve and search through each individual case file.

Similar to BCNR, NRDC reviews service member discharges.
NRDB maintains the Naval Discharge Review Board System
("NDRBS"), which is a local database designed to track
applications submitted by former Navy and Marine Corps service
members.  The NDRBS collects basic applicant information such as
"name, SSN, address, phone number, e-mail address, discharge
characterization of service, and narrative reason for
separation."  (Patterson Supp. Decl. ¶ 5).  The NDRBS can be
searched by category, such as discharge characterization of
service or narrative reason for separation; whether an upgrade
was granted; number of days to process a case; and case storage
location.  After receiving the plaintiffs' request, NRDB
conducted a search of the NDRBS using the terms "personality
disorder," "PD" and "COG(PD)."  (Patterson Supp. Decl. ¶ 5).
NRDB was unable to conduct a similar search for adjustment
disorder and readjustment disorder because the NDRBS does not
separately track those disorders.  While NRDB could find
information on adjustment disorder and readjustment disorder
separations in individual case files, such a search would "take

-42-

considerable expense" and the individual case files are already
publicly available online.  (Patterson Supp. Decl. ¶ 5).

Patterson's declarations are insufficient to show that BCNR
and NDRB conducted adequate searches.  The declarations provide
insufficient detail about the types of files the boards maintain
and how they are organized.  While Patterson states that BCNR
does not maintain a database that would contain information
responsive to the plaintiffs' request, she does not describe
whether BCNR maintains any other files that could have been
searched for responsive documents.  Likewise, while Patterson
adequately describes the NDRBS, she does not state whether the
NDRB maintains any other filing systems that would potentially
contain responsive records, such as policy documents or
memoranda.  Therefore, the declarations are not sufficiently
detailed to show that BCNR and NDRB conducted searches
reasonably calculated to uncover all relevant documents.

The Assistant Secretary of the Navy for Manpower and
Reserve Affairs ("ASN M&RA") is the separation authority for
most officer separations and some enlisted separations.  Peter
Galindez ("Galindez"), an attorney who works in ASN M&RA,
conducted a search of "the entire records database for any
documents that fit [the plaintiffs'] request, including
electronic folder and emails."  (Patterson Decl. ¶ 11).  The
electronic database search "included all folders and files

pertaining to the separation of officers and enlisted, folders
and files that contain policy memos, as well as current and
archived email for these same subjects." (Patterson Supp. Decl.
(Doc. No. 45-16) ¶ 8). The electronic search used the search
terms "PD," "personality disorder," "disorder," "personality
issues," "disorder," "PD policy," "personality policy,"
"policy," "instructions," and "disorder instructions."
(Patterson Supp. Decl. ¶ 8). Galindez also searched all hard
copy files relating to policy memos for the separation of
officers and enlisted, as well as policy guidance maintained by
the ASN M&RA.

ASN M&RA maintains separation records and statistics only
in electronic format. The office retains a scanned copy of the
final determination memo signed by the Assistant Secretary of
the Navy which may or may not reference the specific reason for
a service member's separation. However, the signed separation
documents are searchable only by officer/enlisted status and by
name. Therefore, Galindez was unable to search for individual
separation records by separation reason.

The court finds that Patterson's declaration and
supplemental declaration sufficiently describe the search that
was conducted by the ASN M&RA and shows beyond material doubt
that the search was reasonably calculated to uncover all
relevant documents. The Patterson declarations contain

-44-

reasonable specificity of detail as to the filing systems ASN M&RA maintains, the kind of information contained in each, and how the searches were conducted for responsive documents. The plaintiffs object to Patterson's declaration on the basis that he did not personally conduct or supervise ASN M&RA's search. However, based on the entirety of Patterson's declarations and his statement that "[a]ll information herein contained is based upon information furnished to me in my official capacity and upon my personal review and supervision of the searches conducted," (Patterson Decl. ¶ 2), the court is satisfied that Patterson was sufficiently familiar with and "learn[ed] enough about [the search] to be able to submit a sufficient declaration based on personal knowledge." SWAN I, 888 F. Supp. 2d at 244. Thus, Patterson's declarations show that ASN M&RA's search was adequate.

The Navy Bureau of Medicine and Surgery ("BUMED") is the "record holding activity" for, inter alia, Navy Medicine personnel records, patient health records, patient insurance information, and health care provider credentialing records. It does not maintain records pertaining to administrative separation of service members. Maida, the FOIA and Privacy Act Officer for BUMED, states that while a medical provider may make a note in a service member's record or correspond with a service member's Command recommending a separation based on personality

disorder, BUMED does not keep records of or track whether a
service member is separated on the basis of personality or
adjustment disorder.  Additionally, Maida avers that BUMED does
not create, maintain or receive reports, documents or memoranda
regarding compliance with personality disorder separation
requirements.

BUMED conducted a search of its electronic database of all
BUMED instructions, directives, policy notes, forms,
publications and manuals using the search terms "personality
disorder separation" and "adjustment disorder separation."
(Maida Supp. Decl. (Doc. No. 45-15) ¶ 3).  Maida avers that
other than the database that was searched, he, the BUMED
Secretariat, and the Mental Health Specialty Leader are not
aware of any additional file systems that would contain
responsive documents.

Maida's declarations are insufficiently detailed to show
that BUMED conducted searches that were reasonably calculated to
uncover all relevant documents.  Maida summarily states that he
and others he consulted are not aware that any file systems
other than the database that was searched would contain
responsive documents.  However, he does not describe any of
BUMED's other filing systems or what those systems do contain
which would support his assertion that a search of those systems
was unlikely to result in responsive documents.  As to the

search itself, while Maida provides the two search terms that
were used to search BUMED's database, the search terms appear to
the court to be too narrow, such that potentially relevant
documents may not have been retrieved by the search.  Maida does
not aver that those two search terms would capture all
responsive documents or state why they would.  Thus, Maida's
declarations do not establish beyond material doubt that BUMED's
search was adequate.

Based on the foregoing, the declarations submitted by the
Navy do not meet their burden of showing beyond material doubt
that the search conducted by the Navy was adequate.  Although
the court concludes that ASN M&RA's search was adequate, the
declarations describing the other searches are insufficient to
show that the entire search conducted by the Navy was reasonably
calculated to uncover all relevant documents.  Therefore, the
motion for summary judgment is being denied as to the adequacy
of the search and the plaintiffs are permitted limited discovery
concerning the adequacy of the search.

### 4. *Air Force*

In support of its motion for summary judgment, the Air
Force submitted the declaration of John Espinal ("Espinal"),
Freedom of Information Act Manager, Headquarters Air Force,
Information Management Operations Branch.  After receiving the
request, the action officer assigned to the case determined that

-47-

based on the subject matter of the request, the most likely locations to possess responsive records were the Air Force Central, the Air Force Personnel Center, the Air Staff (specifically Air Force Manpower and Personnel), the Air Force Reserve Center, the Secretary of the Air Force for Manpower and Reserve Affairs, and the Air Force Surgeon General.

The Air Force Surgeon General "performed a search of the Air Force Medical Services (AFMS) Knowledge Exchange Website. The AFMS Knowledge Exchange website is the AFMS intranet designed to store and exchange knowledge among all members of the AFMS community.  The AFMS Knowledge Exchange website was searched for all policy letters signed by [the Air Force Surgeon General] and DSG from 2001-2011."  (Espinal Decl. (Doc. No. 37-14) ¶ 7).  The Air Force Surgeon General also searched the AF/SG Task database using "personality" and "disorder" as keywords.  (Espinal Decl. ¶ 7).  In addition to the electronic searches, the Air Force Surgeon General searched paper files likely to contain responsive material.

Espinal's declaration is not sufficiently detailed to show that the Air Force Surgeon General conducted an adequate search.  He does not sufficiently describe the Air Force Surgeon General's filing system, but instead only identifies two electronic databases that were searched.  Additionally, Espinal does not describe how the office's paper files are organized.

Espinal also does not sufficiently describe the searches.  He does not state how the AFMS Knowledge Exchange website was searched; he only states that the policy letters are organized by year.  With respect to the paper files, he only states that files likely to contain responsive material were searched, but he provides no detail regarding the search.

In the course of responding to the plaintiffs' request, the Air Force Surgeon General forwarded the request to the Air Force Medical Operations Agency.  The Air Force Medical Operations Agency did not conduct a search and instead responded that they would not have responsive documents because "the only records or databases they maintain are personal health records related to individual service members."  (Espinal Decl. ¶ 9).  However, as discussed in Section III.A above, the defendants should have interpreted the plaintiffs' request to include individual service member records.  While it is possible that searching the individual service member records would have been unduly burdensome, the Air Force Medical Operations Agency has not made such a representation.  Therefore, the agency's failure to search for responsive records was not an adequate response to the plaintiffs' request.

Air Force Central responded to the action officer's "tasking" by stating that "they did not possess any material responsive to the instant FOIA request" because "based on their

knowledge and familiarity with their systems and records, they
do not maintain records or databases relating to the subject
matter of the request."  (Espinal Decl. ¶ 10).  Espinal's
description of Air Force Central's response is inadequate
because it states in conclusory fashion that Air Force Central
does not have responsive documents without even stating what
kinds of records or databases it does maintain.

The Air Force Manpower and Personnel office of the Air
Staff conducted a search on its "Electronic Shared Drives using
the key words: 'Personality Disorder' and 'PD.'"  (Espinal Decl.
¶ 11).  Five documents were found as a result of this search.
Espinal's declaration fails to adequately describe the Air Force
Manpower and Personnel office's filing system because he states
only that the Electronic Shared Drive was searched.
Additionally, the declaration does not adequately describe the
search itself.  Moreover, Espinal does not provide an
explanation for why the used the search terms "personality
disorder" and "PD" but did not use other terms, such as
"adjustment disorder" or "readjustment disorder," to identify
responsive documents.  Therefore Espinal's declaration is
insufficient to show that the Air Force Manpower and Personnel
office of the Air Staff conducted an adequate search.

The Secretary of Air Force for Manpower and Reserve Affairs
oversees the Military Review Boards, including the Board for

Correction of Military Records.  The Secretary of Air Force for
Manpower and Reserve Affairs responded to the action officer's
"tasking" by stating that they did not possess responsive
material because "they do not keep records.  They stated that
they obtain records when an individual petitions the board.
Once a decision is made pertaining to that record it is then
sent back to AFPC, which maintains the records."  (Espinal Decl.
¶ 12).  The court construes the statement that the Secretary of
Air Force for Manpower and Reserve Affairs does "not keep
records" to mean that they do not keep individual records.
Espinal's declaration does not address what types of materials
or documents the office does maintain and it does not address
their filing system.  Therefore, the Secretary of Air Force for
Manpower and Reserve Affairs's failure to search for responsive
records was not an adequate response to the plaintiffs' request.

    The Air Force Reserve Center is the command that
"supervises the unit-training program, provides logistics
support, and ensures combat readiness."  (Espinal Decl. ¶ 13).
The Air Force Reserve Center informed the plaintiffs that they
did not possess any responsive records because they "do not
maintain records of former members of the Air Force Reserve."
(Espinal Decl. ¶ 13).  However, as with the Secretary of Air
Force for Manpower and Reserve Affairs, Espinal's declaration
does not address what types of materials or documents the Air

Force Reserve Center does maintain and it does not address the center's filing system.  Thus, the Air Force Reserve Center's failure to search for responsive records was not an adequate response to the plaintiffs' request.

After receiving the plaintiffs' request, the Air Force Personnel Center determined that the Separations Programs and Procedures Branch was the office within the Air Force Personnel Center that was the most reasonable and likely location of the information that the plaintiffs sought.  The Separations Programs and Procedures Branch is "responsible for implementing separation policy and administrative procedures for all Air Force members."  (Espinal Decl. ¶ 16).  All files maintained by the Separations Programs and Procedures Branch are in electronic form.  "Although some printed (hard copy) material is maintained for reference," Espinal avers that all responsive documents would be maintained electronically.  (Espinal Decl. ¶ 17).  Thus, the branch "searched the electronic files maintained on their share[d] drive using the keywords 'Personality Disorder' and 'Mental Disorder."  (Espinal Decl. ¶ 17).  In his supplemental declaration, Espinal states that the Separations Programs and Procedures Branch also searched using the keyword "Adjustment Disorder."  (Espinal Supp. Decl. (Doc. No. 45-1) ¶ 2(e)).  In addition to the shared drive, the branch obtained electronic files from the Air Force E-Publishing website and

searched for responsive emails.  Based on its searches, the
Separations Programs and Procedures Branch worked with the
Research Analysis & Data Division to create two charts.

Espinal's declaration is insufficiently detailed to show
that the Air Force Personnel Center conducted an adequate
search.  The declaration states that the Separations Programs
and Procedures Branch was the most likely to contain responsive
documents but does not address whether it was likely that other
branches would have responsive documents.  The declaration also
does not adequately describe the Separations Programs and
Procedures Branch's filing system.  Although Espinal does state
that the branch searched its electronic files and the Air Force
E-Publishing website, he does not state how the electronic files
are maintained and/or organized.  Additionally, he does not
state how the search was conducted or which keywords were used
to search the Air Force E-Publishing website or the branch's
emails.  Thus, the court cannot determine whether the Air Force
Personnel Center's search was reasonably calculated to uncover
all relevant documents.

Espinal's declaration does not show beyond material doubt
that the search conducted by the Air Force was adequate.
Therefore, the motion for summary judgment is being denied as to
the adequacy of the search and the plaintiffs are permitted
limited discovery concerning the adequacy of the search.

### 5. Marine Corps

In support of its motion for summary judgment, the Marine Corps submitted the declaration of Teresa Ross ("Ross"), Head of the Freedom of Information Act (FOIA)/Privacy Act (PA) Section at Headquarters, U.S. Marine Corps (HQMC).  After receiving the plaintiffs' request letters, Ross determined that the HQMC Manpower and Reserve Affairs ("M&RA") department was the Marine Corps department that would contain responsive documents because it is responsible for policy regarding military personnel matters.  Ross contacted Tom Damisch ("Damisch"), counsel for the M&RA Policy Branch for assistance in determining which branches of the M&RA department would have responsive documents. Based on the input she received from Damisch and other "knowledgeable M&RA personnel," Ross concluded that the Manpower Separations and Requirement Branch was the appropriate department to respond to the plaintiffs' request. (Ross Decl. (Doc. No. 37-15) ¶ 10).  Specifically, Ross recommended that the M&RA Manpower Information Technology Branch compile the numbers requested by Items 1 and 2 of the plaintiffs' request and that the Manpower Separations and Retirements Branch respond to Items 3-11.

The Manpower Information Technology Branch generated information responsive to Items 1 and 2 of the requests by querying the Marine Corps Total Force System ("MCATS") and the

Operational Data Storage Enterprise ("ODSE") databases.  In
conducting the queries, the Manpower Information Technology
Branch used the following criteria: "Separation Program
Designator (SPD) codes, characterization of discharge codes,
separation dates, Primary Reporting Unit codes (RUCs), Monitor
Command Codes (MCCs), unit discharged from, IDP From Date (if
deployed to a combat zone), IDP country, combat award, Purple
Heart recipient, and fiscal year."  (Ross Decl. ¶ 14).

    In addition to the database search conducted by the
Manpower Information Technology Branch, the Manpower Separations
and Retirements Branch "conducted a search of their office paper
files and desk drawers for any item related to personality
disorder."  (Ross Decl. ¶ 15).  The Manpower Information
Technology Branch also conducted an electronic search: "staff
searched their MSOutlook accounts, to include saved .pst files,
and their computer hard drive and shared drive electronic
folders for any electronic documents pertaining to personality
disorder issues using search terms reasonably calculated to
uncover responsive information, such as the term 'personality
disorder' and within the relevant time frame."  (Ross Decl. ¶
15).  The branch advised Ross that they were not the proper
office to address Items 3, 8 and 11 and informed Ross that
departments and officials outside of the Marine Corps would have
responsive documents.

Ross's declaration is insufficient to meet the Marine Corps's burden of showing beyond material doubt that it conducted a search reasonably calculated to uncover all relevant documents because it is not sufficiently detailed.  With respect to the search conducted by the Manpower Information Technology Branch, she does not state what types of information are contained in the MCATS and ODSE databases or whether searches of other databases would have provided responsive information. With respect to the Manpower Separations and Retirements Branch, Ross's declaration does not adequately describe the branch's filing system.  While she states that computer hard drives, shared drives, and email accounts were searched, the court is unable to discern whether there are other electronic files which were not searched, and if there are, why they were not searched. Additionally, Ross does not aver that she took any steps to determine whether there were other branches within the Marine Corps which could respond after the branch informed her that they were unable to respond to Items 3, 5, 8 and 11.  Therefore, the motion for summary judgment is being denied as to the adequacy of the search and the plaintiffs are permitted limited discovery concerning the adequacy of the search.

### 6.  *National Guard*

In support of its motion for summary judgment, the National Guard submitted the declaration of Jennifer Nikolaisen

("Nikolaisen"), Chief of the Office of Information and Privacy at the National Guard Bureau and the Chief Freedom of Information Act and Privacy Officer for the National Guard. Nikolaisen states that her office construed the plaintiffs' FOIA requests as seeking records from the Air National Guard, the Army National Guard and the National Guard Bureau.  Based on her knowledge of the National Guard Bureau's organization and in coordination various National Guard Bureau staff, Nikolaisen identified the National Guard Bureau offices most likely to have responsive documents.  She also had the Army National Guard and Air National Guard coordinate searches for responsive records.

     With respect to the National Guard Bureau, Nikolaisen states that the offices searched included the Joint Manpower and Personnel Directorate, Psychological Health Division and the Joint Surgeon Office.  The Joint Manpower and Personnel Directorate, Psychological Health Division, "conducted a physical and visual search of its files and its contractor-operated SharePoint database."  (Nikolaisen Decl. (Doc. No. 37-16) ¶ 12(a)).  Likewise, the Joint Surgeon Office "conducted a physical and visual search of its files and its shared network hard drive . . . .  The specific key word used to conduct electronic searches was 'mental health.'"  (Nikolaisen Decl. ¶ 12(b)).  Neither search produced any responsive documents.

Nikolaisen's declaration is insufficient to satisfy the National Guard Bureau's burden because it is not reasonably detailed and does not show that the National Guard Bureau conducted a search that was reasonably calculated to uncover all relevant documents. Nikolaisen states that the National Guard Bureau's search included the Joint Manpower and Personnel Directorate, Psychological Health Division and the Joint Surgeon Office, but she does not state which, if any, other offices were searched and what their search entailed. The declaration also does not adequately describe either office's filing system or the search that was conducted. Simply stating that the database and hard drive were searched does not provide any indication of whether there are other files that the offices maintain that could have been searched. With respect to the Joint Manpower and Personnel Directorate, Psychological Health Division, Nikolaisen does not state how the database was searched or which search terms were used. With respect to the Joint Surgeon Office, Nikolaisen states that the hard drive was searched using the term "mental health." She does not state why only that search term was used, as opposed to personality disorder, adjustment disorder or readjustment disorder, or that "mental health" was reasonably likely to produce relevant documents. Thus, Nikolaisen's declaration is insufficient to show that the National Guard Bureau conducted an adequate search.

With respect to the Air National Guard, Nikolaisen states that searches were conducted at the Air National Guard Readiness Center of offices including the Air National Guard, Manpower, Personnel and Services and the Air National Guard, Office of the Air Surgeon.  These offices were selected "because it was believed that they may have responsive personnel or medical data, administrative separations regulations, or medical policy documents associated with the separation of Air National Guard personnel, to include separations based on personality disorder, adjustment disorder, or readjustment disorder."  (Nikolaisen Decl. ¶ 11).  The Air National Guard, Manpower, Personnel and Services "conducted a physical and visual search of its files and its shared network hard drive . . . .  Specific key words used to conduct electronic searches included 'adjustment disorder,' [']readjustment disorder,' and 'personality disorder.'"  (Nikolaisen Decl. ¶ 12(f)).  The Air National Guard, Office of the Air Surgeon did not conduct a search because the office "does not maintain medical records and does not make decisions or maintain records concerning discharges of any kind," and therefore it determined that it had no records to search that would be potentially responsive.  (Nikolaisen Decl. ¶ 12(g)).

Nikolaisen's declaration is insufficiently detailed to meet the Air National Guard's burden of showing that its search was

adequate.  As with the National Guard Bureau, Nikolaisen states
that the offices searched <u>included</u> the Air National Guard,
Manpower, Personnel and Services and the Air National Guard,
Office of the Air Surgeon, but she does not provide which, if
any, other offices were searched or that the two offices she
identifies were the only ones reasonably likely to contain
responsive documents.  Additionally, the declaration does not
adequately describe the filing system of either office such that
the plaintiffs, or the court, would be able to determine whether
the search conducted, or in the case of the Air National Guard,
Office of the Air Surgeon, the failure to search, was
reasonable.  The individual who conducted the search at the Air
National Guard, Manpower, Personnel and Services informed
Nikolaisen that certain responsive documents are "under the
control and possession of either [the] Air Reserve Personnel
Center (ARPC) or National Personnel Records Center (NPRC)."
(Nikolaisen Decl. ¶ 12(f)).  Nikolaisen does not state that
either of these offices were searched for responsive documents
or state why they were not searched.  The Air National Guard's
failure to search these two offices suggests that its search for
responsive documents was inadequate.  Thus, Nikolaisen's
declaration is insufficient to show that the Air National Guard
conducted an adequate search.

With respect to the Army National Guard, Nikolaisen states that searches were "conducted by offices at the Army National Guard Readiness Center, including the Army National Guard, Human Resources Management Division . . . ; Army National Guard, Human Resources Policy Division . . . ; and Army National Guard, Office of the Chief Surgeon."  (Nikolaisen Decl. ¶ 10).  The Human Resources Management Division "conducted a physical and visual search of its files and the personnel databases it is authorized to access, including the Total Army Personnel Data Base – Guard (TAPDB-G) . . . .  To obtain responsive data from these personnel databases, data was extracted using the following 'loss reason codes': Personality Disorder (PA), Other Disqualifying Patterns or Acts of Conduct (OC), and Other Reasons Approved by the Chief, NGB (OE)."  (Nikolaisen Decl. ¶ 12(c)).  The Human Resources Policy Division "conducted a physical and visual search of its files, its shared network hard drive . . . , and the policy databases it is authorized to access, including the Army National Guard G1 Portal . . . and the Guard Knowledge Online Portal . . . .  Specific key words used to conduct electronic searches included 'separation,' 'mental,' 'health,' and 'disorder.'"  (Nikolaisen Decl. ¶ 12(d)).  The Office of the Chief Surgeon "conducted a visual check of the electronic records maintained on its shared network drive."  (Nikolaisen Decl. ¶ 12(e)).  The search produced no

responsive documents and explained that result by stating that
the office does not contain any individual medical records or
make decisions concerning discharges.

Nikolaisen's declaration is insufficiently detailed to meet
the Army National Guard's burden of showing that its search was
adequate.  Nikolaisen states that the offices searched <u>included</u>
the Army National Guard, Human Resources Management Division,
the Army National Guard, Human Resources Policy Division and
Army National Guard, Office of the Chief Surgeon, but she does
not state which, if any, other offices were searched or that the
offices she identifies were the only ones reasonably likely to
contain responsive documents.  Additionally, the declaration
does not adequately describe the filing system of the offices
such that the plaintiffs, or the court, could determine whether
the searches conducted were reasonable.  The declaration states
that both the Human Resources Management Division and the Human
Resources Policy Division maintain databases.  However,
Nikolaisen does not describe the different kinds of information
stored in the various databases and whether all or only some of
the databases were searched for responsive documents.  Thus,
Nikolaisen's declaration is insufficient to show that the Army
National Guard conducted an adequate search.

Nikolaisen's declaration does not show beyond material
doubt that the searches conducted by the National Guard Bureau,

Air National Guard and Army National Guard were adequate.
Rather, her declaration shows that several of the searches were
not reasonably calculated to uncover all relevant documents.
Therefore, the motion for summary judgment is being denied as to
the adequacy of the searches conducted by the National Guard
Bureau, Air National Guard and Army National Guard and the
plaintiffs are permitted limited discovery concerning the
adequacy of the search.

### 7.   *Veteran's Health Administration*

The VHA submitted the declaration of Timothy Graham
("Graham"), Director of the Freedom of Information Act Office
for the Veterans Health Administration at the Department of
Veteran Affairs Central Office.  Upon receiving the plaintiffs'
request letter, Graham determined, based on his expertise and
knowledge of the mission, programs and operations of VHA, that
the benefits claim information sought by the plaintiffs was a
benefit claim that would have been administered by the Veterans
Benefits Administration, rather than the VHA.  However, when he
searched the requestors' name in the VA's electronic FOIA
tracking system, Graham saw that VBA had already received the
same request, and therefore he did not need to send the request
to the VBA.

Although VHA's function is "to provide a complete medical
and hospital service for the medical care and treatment of

-63-

veterans" and it is not responsible for providing services related to the determination of benefits, Graham determined that the VHA Chief Business Office (CBO) Business Policy component and the VHA CBO Health Eligibility Center (HEC) may have responsive documents.  (Graham Decl. (Doc. No. 37-17) ¶ 10). Graham avers that this determination was "specifically made based on [his] extensive experience in handling agency records searches, coupled with a thorough understanding of the operations and activities of all VHA programs, offices and records systems."  (Graham Decl. ¶ 10).  He further states that those two offices were specifically chosen because they "deal with eligibility for health care benefits" within the larger VHA CBO which is responsible for the "development of administrative processes, policy, regulations, and Directives associated with the delivery of VA health benefit programs."  (Graham Decl. ¶ 10).  Based on his experience, Graham determined that the VHA CBO was the only VHA office responsible for the implementation of eligibility for health care benefits.

The CBO Business Policy component does not own any databases.  Instead, the component "issues policy documents such as Directive and Handbooks utilized to provide guidance to the VHA medical centers to assist them in implementing" the statutes and regulations that guide the programs operated by the CBO. (Graham Decl. ¶ 11).

The CBO HEC is responsible for managing the Enrollment and
Eligibility System.  The Enrollment and Eligibility System
collects information provided by veterans who submit VA Form 10-
10EZ, Application for Health Benefits.  While the form does ask
whether a veteran's discharge from the military was "for a
disability incurred or aggravated in the line of duty," the
veteran may only respond "yes" or "no."  (Graham Supp. Decl.
(Doc. No. 45-18) ¶ 3).  The form does not ask, and thus the
database does not contain, "information related to benefits
determinations made by VBA on the basis of personality
disorders."  (Graham Decl. ¶ 11).  The other database that the
HEC owns is an Income Verification Match database which is used
to match veteran reported income with the Internal Revenue
Service and the Social Security Administration.  Graham
determined that this database would not contain responsive
information, and therefore it was not searched.  While it is
unclear whether the HEC owns any other databases, because the
VHA does not collect or maintain information related to a
service member's discharge diagnosis, Graham averred that no
other VHA database or system "contains the information [that the
plaintiffs' seek regarding] discharge diagnosis or reason for
separation."  (Graham Supp. Decl. ¶ 6).

The staff at the CBO Business Policy component and the HEC
searched the two VA websites likely to contain responsive

material for policy documents, forms, fact sheets, directives,
and handbooks to find responsive documents.  They informed
Graham that their searches did not result in any responsive
documents.  While veterans are encouraged to submit form DD-214,
which may contain a discharge diagnosis, with their VA Form 10-
10EZ, not all veterans do so, and even when they do, the form is
not available in a searchable format.  Thus, to determine
whether a given veteran was discharged for personality disorder,
adjustment disorder or readjustment disorder, the VHA would have
to conduct a manual search of over four million electronic
medical records.

     The court finds that Graham's declaration sufficiently
describes the search that was conducted by the VHA and shows
beyond material doubt that the search was reasonably calculated
to uncover all relevant documents.  Graham describes in detail
why the CBO Business Policy component and the CBO HEC offices
were selected to conduct the searches and averred that based on
his experience, no other office was likely to maintain
responsive records.  He describes the kinds of information each
office maintains and how such information is stored.  While
Graham does not state the search terms that were used to search
the VA's websites for responsive documents, he provides the
Internet addresses for the websites; a visit to each shows that
they are not searchable by keyword.  Additionally, the court

credits Graham's statement that the VHA does not maintain
information on discharge diagnoses because it is not relevant to
the VHA's mission.  Thus, the court finds that Graham's
declaration was not conclusory but instead contained reasonable
specificity of detail as to the search undertaken by VHA for
responsive documents.  Because Graham's declaration shows that
VHA's search was adequate, the motion for summary judgment is
being granted as to the adequacy of the search conducted by VHA.

### 8. *Veterans Benefits Administration*

The Veterans Benefits Administration submitted the
declaration of Sean Burns ("Burns"), Chief of Administration for
the Office of Facilities, Access and Administration with the
U.S. Department of Veterans Affairs, Veterans Benefits
Administration.  Although the declaration is submitted by Burns,
it was originally drafted and executed by Francis Victoria
Hudzik ("Hudzik") who was the VBA FOIA Officer who coordinated
and supervised the search.  Hudzik passed away prior to the date
the declaration was submitted.  Thus, the declaration is
submitted by Burns because he was Hudzik's immediate supervisor
and he was "familiar with the steps she took in locating
documents responsive to the plaintiffs' FOIA request."  (Burns
Decl. (Doc. No. 37-18) ¶ 1).

Upon receiving the request, Hudzik contacted the FOIA
Officer for the Compensation & Pension Service.  Because

Compensation & Pension Service is the office within VBA
responsible for establishing policies and procedures associated
with disability and compensation pension benefits, it was
determined that it was the appropriate and only office to
respond to the plaintiffs' request.

The Compensation & Pension Service "sets policy and
promulgates regulations associated with benefits, establishes
procedures for processing benefits, creates business
requirements for information technology systems, manages special
initiatives, assesses and improves the quality of field
operations and generates training provided to field staff."
(Burns Decl. ¶ 9).  In order to administer its benefits
programs, the Compensation & Pension Service gathers and creates
records.  The records the office "owns" include "documents
(written or electronic) associated with programs (including
analyses), policies, procedures, training, information
technology, management, facilities of VBA, reporting, FOIA, etc.
as well as electronic database[] entries associated with the
management of VBA staff (such as employee workload) or
associated with the management of VBA information systems (e.g.
security databases)."  (Burns Decl. ¶ 10 n.2).

VBA uses several technology systems and databases to track,
process and pay disability compensation and pension benefits.
These systems and databases are the Beneficiary Identification

and Records Locator System; the Corporate Database; the Virtual
VA, which is the VBA's document depository; and the Veterans
Service Network.  While these systems contain some information
relating to a veteran's claim, the VBA's information technology
systems do not include a veteran's service medical records.  In
addition to the technology systems and databases, the VA
maintains an Internet website and a number of Intranet sites.
The VBA Intranet site links to the Intranet sites for the
various VBA offices.

The Compensation & Pension Service Intranet "has links to
[Compensation & Pension Service] divisions including: Policy,
Procedures, Training and Contract Management, Quality Assurance,
and Business Management, plus a miscellaneous category that
lists links to that division's major responsibilities, items of
interest, and staff."  (Burns Decl. ¶ 12).  The Compensation &
Pension Service Intranet search page allows a user to search by
word or phrase and by subject.

The Compensation & Pension Service FOIA Officer searched
the Compensation & Pension Service Intranet for responsive
documents using "personality disorder," "adjustment disorder,"
and "readjustment disorder" as keywords.  "The terms 'discharge'
and 'separation' were used as additional identifiers."  (Burns
Decl. ¶ 13).  The FOIA Officer also searched the Compensation &
Pension Service's internal computer shared drive where employees

store work product; the VA Internet, where the VA published
publicly available information; and the Consolidated VBA reports
listing, which is a record of all of the reports that were run
on the database that preceded the Veterans Service Network
database.

The searches run by the Compensation & Pension Service did
not result in any responsive documents.  Burns states that VBA
does not track discharge diagnoses in its information technology
systems or databases.  While discharge diagnoses may be found in
veterans' service medical records, those records are generally
not maintained electronically, and when they are, they are not
in a searchable format.  Discharge diagnoses are also likely
found on form DD-214.  Some DD-214 forms are maintained
electronically but the VBA technology systems do not contain a
data field to search by discharge diagnosis.  Other DD-214 forms
are found in individual veterans' physical claims files.[12]

After the plaintiffs appealed VBA's response, VBA contacted
to Office of Performance, Analysis and Integrity and the Office
of Field Operations to conduct additional searches.  The Office
of Performance, Analysis and Integrity maintains the Enterprise
Data Warehouse (EDW), which collects and retains data from VBA
systems on a nightly basis.  However, because VBA's systems from

---

[12] As discussed in Section III.A.2, the court finds that searching the
individual claims files would be unduly burdensome, and therefore the VBA and
VHA were not required to search those files.

which the data is collected do not contain discharge diagnoses,
the EDW could not contain that information either.  The Office
of Field Operations directs the operations of VBA field offices.
The office searched its Intranet site, which resulted in one
responsive document.

The court finds that Burns's declaration sufficiently
describes the search that was conducted by the VBA and shows
beyond material doubt that the search was reasonably calculated
to uncover all relevant documents.  Burns describes why the
Compensation & Pension Service was selected as the only office
within VBA to conduct the search.  He describes the kinds of
information and documents that the Compensation & Pension
Service maintains and the various places that such information
is stored.  Burns provides the terms that were used to search
the Compensation & Pension Service's various electronic data
systems and explains why VBA was largely unable to find
responsive documents, i.e. it does not track discharge diagnoses
and it would be unduly burdensome to search the only places
where such information could be found.  Additionally, the court
credits Graham's statement that the VHA does not maintain
information on discharge diagnoses because it is not relevant to
the VHA's mission.

In addition to their other objections to VBA's search and
the Burns declaration, the plaintiffs argue that there is

countervailing evidence that VBA's search was inadequate.  They
state that the Veterans Service Network database "includes a
variable for Military Separation Reason.  It appears that a
simple electronic search will provide non-identifying data
precisely responsive to Plaintiffs' request, by revealing the
amount of VBA compensation or pension received by veterans whose
military separation reason was [personality disorder] or
[adjustment disorder] . . . ."  (Pls.' Mem. Opp. Mot. Summ. J.
at 46).  Burns filed a supplemental declaration to in response
to the plaintiffs' critique.  Burns states that there are two
types of records in the Veterans Service Network database: "(1)
Veteran records, which contain information about benefits paid
to Veterans; and, (2) beneficiary records, which contain
information about benefits paid to surviving spouses, children
and parents."  (Burns Supp. Decl. (Doc. No. 45-17) ¶ 2).
Contrary to the inference, drawn by the plaintiffs, that the
Military Separation Reason field would relate to the reason for
a service member's separation, and therefore reveal whether a
service member was separated for personality disorder or
adjustment disorder, the field corresponds to the Separation
Reason Code in the Beneficiary Identification and Records
Locator Subsystem.  The only possible entries in that field are
codes that mean "Development may be required," "Satisfactory;"
or "Administrative Decision."  (Burns Supp. Decl. ¶ 4).  Thus,

the military separation reason field could not be searched for responsive documents.

Based on the foregoing, the court finds that Burns's declaration was not conclusory but instead contained reasonable specificity of detail as to the search undertaken by VBA for responsive documents.  Because Burns's declaration shows that VBA's search was adequate, the motion for summary judgment is being granted as to the adequacy of the search conducted by VBA.

### D.  **Exemptions**

The defendants move for summary judgment as to the propriety of their redaction of various documents pursuant to FOIA Exemption 6.[13]

Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 6 is intended to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982).  "To determine whether identifying information may be withheld pursuant to Exemption 6 [the court] must: (1) determine whether

---

[13] The plaintiffs originally objected to the Air Force withholding information in document 11-L-0109 VVA (AF) 1279-1303.  However, in their memorandum in opposition to the instant motion, the plaintiffs state that they "agreed not to challenge [those] redactions . . . ."  (Pls.' Opp. Mot. Summ. J. at 48 n.24).

the identifying information is contained in personnel and medical files and similar files; and (2) balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy." Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 291 (2d Cir. 2009) (internal quotation marks omitted).

"The balancing analysis for FOIA Exemption 6 requires that we first determine whether disclosure of the files would compromise a substantial, as opposed to de minimis, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." Long v. Office of Pers. Mgmt., 692 F.3d 185, 191 (2d Cir. 2012) (quoting Multi Ag Media LLC v. Dep't of Agric., 515 F.3d 1224, 1229 (D.C. Cir. 2008). "But the bar is low: FOIA requires only a measurable interest in privacy to trigger the application of the disclosure balancing tests." Id. (internal quotation marks omitted).

"[W]hen an agency seeks to withhold information, it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." Morley, 508 F.3d at 1122 (internal quotations omitted). "This justification typically takes the form of a Vaughn index, named for the case

that introduced it." El Badrawi, 583 F. Supp. 2d at 310 (citing
Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973)). "The Vaughn
index must explain specifically which of the nine statutory
exemptions to FOIA's general rule of disclosure supports the
agency's decision to withhold a requested document or to delete
information from a released document." Founding Church of
Scientology, Inc. v. Bell, 603 F.2d 945, 947 (D.C. Cir. 1979).
Furthermore, the Vaughn index must provide "information that is
not only specific enough to obviate the need for an in camera
review, but that also enables the court to review the agency's
claimed redactions without having to pull the contextual
information out of the redacted documents for itself." Halpern,
181 F.3d at 294.

### 1. Sufficiency of Vaughn Index

The plaintiffs contend that the defendants "have failed to
produce an adequate Vaughn index sufficient to allow Plaintiffs
to contest, and this Court to determine, the applicability of
the claimed exemption." (Pls.' Mem. Opp. Mot. Summ. J. at 49).
The plaintiffs' argument lacks merit. The defendants' Vaughn
index identifies each document where information was redacted,
the type of document it is, the claimed exemption and the basis
for redacting the information pursuant to that exemption. As
shown below, based on the Vaughn index, the court is able to

-75-

determine whether the redaction was proper based on the claimed exemption.  Therefore the Vaughn index is sufficient.

### 2.    *Redaction of Sample Separation Packets*

The defendants released several heavily redacted sample separation packets to the plaintiffs.  The defendants state that the redactions were made pursuant to Exemption 6.  While the plaintiffs agreed that most of the redactions were proper, they disagreed with the defendants' redaction of service members' rank, dates of service and place of last assignment.

It is undisputed that the files at issue here constitute "personnel and medical files and similar files" in which the individual service members have a significant privacy interest. Associated Press, 554 F.3d at 291.  However, the plaintiffs argue that a service member's rank, dates of service and place of last assignment does not constitute personally identifying information, and as such, could not have been redacted.

The Supreme Court has held that "what constitutes identifying information regarding a subject [individual] must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar . . . with other aspects of [the individual]."  Dep't of Air Force v. Rose, 425 U.S. 352, 380 (1976).  In Rose, New York University law students sought Air Force Academy Honor and Ethics Code case summaries for a law review project on military discipline.  The

Academy had already publicly posted these summaries on forty squadron bulletin boards, usually with identifying names redacted (names were posted for cadets who were found guilty and who left the Academy), and with instructions that cadets should read the summaries only if necessary.  The court noted, however, that even with names redacted, the subjects of the summaries could likely be identified through other, disclosed information. Therefore, the <u>Rose</u> Court recognized that "<u>[e]ven though the summaries, with only names redacted, had once been public,</u> [there was] the potential invasion of privacy through later recognition of identifying details." <u>U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press</u>, 489 U.S. 749, 769 (1989). Thus, the other identifying information could be redacted, particularly in light of the fact that the redacted information was "irrelevant to the inquiry into the way the Air Force Academy administered its Honor Code; leaving the identifying material in the summaries would therefore have been a 'clearly unwarranted' invasion of individual privacy." <u>Id.</u> at 773-74.

The reasoning of <u>Rose</u> and the explanation in <u>Reporters Comm.</u> is applicable here.  The defendants state that they redacted information regarding rank, dates of service and place of last assignment because although, standing alone, those items do not invoke privacy concerns, "in the aggregate this information could be used to identify the individuals,

especially by members of the public who have knowledge of the
individual or the circumstances surrounding the individual's
military career." (Defs.' Mem. Supp. Summ. J. at 23). The
information contained in the separation packets is highly
sensitive[14] and the individual service members' have a strong
interest in not having that sensitive information linked them.
Additionally, the plaintiffs do not articulate and it is not
apparent how information in a service member's separation packet
regarding rank, dates of service and place of last assignment
would be relevant to "the use by [the defendants] of personality
disorder discharges and adjustment disorder or readjustment
disorder discharges to separate [service members]." (Am. Compl.
Ex. A at 1, Ex. C at 1).

    Thus, in light of the fact that rank, dates of service and
place of last assignment could be used by knowledgeable
individuals to link the service member to highly sensitive
material and it is not apparent how this information would shed
light on the defendants' use of personality and adjustment
disorder discharges, the court finds that redaction was

---

[14] The separation packet "includes documentation of the discharge itself, pre-service interviews and evaluations, medical records, performance evaluations, psychological treatment records, and counseling or disciplinary records. The medical records contained in the files often reveal the most intimate details of a service member's life -- such as descriptions of personal conflict with family, friends, and co-workers; discussions of suicidal thoughts; descriptions of the service member's attempts to harm him or herself; and physicians' diagnoses and treatment recommendations." (Herrington Decl. ¶ 12).

appropriate.   Therefore, the motion for summary judgment is
being granted as to the defendants' redaction of rank, dates of
service and place of last assignment in the sample separation
packets pursuant to Exemption 6.

### 3.   *Redaction of DoD Employee Information*

Invoking Exemption 6, the DoD redacted the names, other
identifying information and contact information of low-level DoD
officials in the documents that were released to the plaintiffs.

"It is not uncommon for courts to recognize a privacy
interest in a federal employee's work status (as opposed to some
more intimate detail) if the occupation alone could subject the
employee to harassment or attack."  Long, 692 F.3d at 192.
Here, the court finds that the low-level DoD officials have more
than a de minimis privacy interest in their names and
identifying information because their employment with the DoD
could subject them to harassment or attack.   In his declaration,
Herrington, an Associate Deputy General Counsel in the Office of
General Counsel Office of the United States Department of
Defense, avers that the "DoD policy is to withhold names of all
military personnel at the rank of Colonel and below, and all
civilians at the rate of GS-15 and below. . . .   These
individuals have a legitimate privacy interest that would be
threatened if this information was publicly disclosed and there
is no public interest in having this information disclosed."

(Herrington Decl. ¶ 16).  Moreover, courts routinely hold that lower-level DoD employees have more than a de minimis interest in not having their names disclosed.  See, e.g., Carmody & Torrance v. Def. Contract Mgmt. Agency, No. 3:11-CV-1738, 2014 WL 1050908, at *13 (D. Conn. Mar. 13, 2014) (finding that DoD employees' interest in not having their names disclosed in connection with a defense contract was more than de minimis); Amnesty Int'l USA v. C.I.A., 728 F. Supp. 2d 479, 523-25 (S.D.N.Y. 2010) (finding that "DOD personnel below the office-director level, or officers below the rank of Colonel" had a legitimate privacy interest in not having their names and email addresses disclosed); Schoenman v. F.B.I., 575 F. Supp. 2d 136, 160 (D.D.C. 2008) ("Air Force members whose names and other identifying information was redacted from the Intelligence Information Reports have a significant -- i.e., more than de minimis -- privacy interest in that information."); Kimmel v. U.S. Dep't of Def., No. 04-1551, 2006 WL 1126812, at *3 (D.D.C. Mar. 31, 2006) ("[T]he court has little difficulty concluding that the name of an individual employed by DoD is the type of information that the exemption seeks to protect.")

Because the court finds that the DoD employees have a privacy interest in not having their names disclosed, the court must balance that interest against the public's interest in disclosure.  Where the agency has demonstrated a privacy

interest sufficient to implicate Exemption 6, the burden falls to the requesting party to establish that disclosure "would serve a public interest cognizable under FOIA."  Carmody & Torrance, 2014 WL 1050908, at *13 (quoting Associated Press, 554 F.3d at 66).  "The only public interest cognizable under FOIA is the public understanding of the operations or activities of the government."  Long, 692 F.3d at 193.

The public interest in this case is negligible or nonexistent.  The plaintiffs have articulated no public interest that would be served by releasing the employees' names.  "In many contexts, federal courts have observed that disclosure of individual employee names tells nothing about what the government is up to."  Id.  Because the plaintiffs have not articulated how disclosure of the lower-level DoD employees' names would serve the public interest or show "what the government is up to," the court finds that the public's interest in disclosure does not outweigh the employees' privacy interest.

Therefore, because the defendants properly invoked Exemption 6 in redacting individual DoD employees' names, other identifying information and contact information, the motion for summary judgment is being granted as to the propriety of the redactions.

**IV.   CONCLUSION**

Therefore, Defendants' Motion for Summary Judgment (Doc. No. 37) is hereby GRANTED in part and DENIED in part.  The motion is being granted as to the defendants' argument that they were not required to produce the individual service member files; the adequacy of the searches conducted by VHA and VBA; and the propriety of the defendants' redactions pursuant to Exemption 6.  The motion is being denied as to the adequacy of the searches conducted by the DoD, Army, Navy, Air Force, Marine Corps and National Guard.

It is so ordered.

Signed this 31st day of March, 2014 at Hartford, Connecticut.

_____/s/_____

Alvin W. Thompson
United States District Judge
